# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

MELISSA VARGA,

        Plaintiff,

    v.                                          Case No. 10-C-0454

MICHAEL J. ASTRUE,
Commissioner of Social Security Administration,

        Defendant.

## DECISION AND ORDER

Plaintiff Melissa Varga (hereinafter "Plaintiff" or "Varga") seeks judicial review of the final decision of the Commissioner of the Social Security Administration denying her applications for Disability Insurance Benefits ("DIB") under Title II and Supplementary Security Income ("SSI") under Title XVI of the Social Security Act ("Act"). 42 U.S.C. § 405(g). In her application for DIB, Plaintiff claimed that a disability has limited her ability to work since December 2, 2005. (Tr.83.) After the Social Security Administration denied her applications initially and upon reconsideration, Plaintiff requested a hearing.

On April 17, 2009 Administrative Law Judge Mary L. Everstine (hereinafter "ALJ") conducted a hearing at which Varga, represented by counsel, appeared and testified. Based upon her testimony, the testimony of a vocational expert, and the medical evidence presented, the ALJ concluded, in a June 8, 2009 decision, that Plaintiff did not have an impairment or combination of impairments qualifying her for benefits. The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied review.

Varga argues that the ALJ failed to appropriately consider the opinions of two of her treating physicians, that the ALJ's credibility assessment was not supported by substantial evidence, and that the ALJ did not give proper consideration to the prior disability determination made by the Department of Veteran's Affairs ("VA"). For the reasons set forth below, the Commissioner's decision will be reversed and the case remanded for further proceedings.

## BACKGROUND

Varga applied for Social Security Disability benefits on June 28, 2006 stating that her disability began on June 13, 2003. (Tr. 12, 83) At the time of the hearing before the ALJ, Varga was 36 years old. (Tr. 24.) She has one eight year-old daughter. She is married and her husband has a full time job. (*Id.*) She is a high school graduate and has completed two years of college courses. (*Id.*)

Varga has worked for a number of different employers. She was in the Army between 1993 and 1995, advancing to the rank of Specialist. (Tr. 83.) She also worked briefly in several positions after getting out of the Army including work as a phone dispatcher with the Adams County Sheriff's Department, as a cook at an upscale restaurant, as a security guard at a Casino, and as a stocker at a grocery store. (Tr. 24-25, 32-33.) Later she was employed doing manual labor in a paper mill for a little over two years. (Tr. 25, 33.) She worked as a correctional officer for approximately a year. (Tr. 33.) Finally she worked as a secretary for a federal prison, a position she held for about eight years. (Tr. 33, 89.)

Varga has not worked since December 2, 2005. (Tr. 14.) On March 29, 2006 the United States Office of Personnel Management approved her application for a medical retirement. (Tr. 80.) The VA has also determined that Varga has a 90% service-connected disability. (Tr. 636.)

2

## I. Varga's Testimony

Varga, represented by counsel, appeared and testified at the April 17, 2009 hearing. (Tr. 23.) She testified that her ability to work was limited by pain stemming from migraine headaches, fibromyalgia, and endometriosis. (Tr. 26.) As a result of these conditions, Varga testified that she didn't know whether she would be able to walk day to day. She testified that she used to be a workaholic but that the stress of never knowing whether she would be able to function prevented her from being able to hold a job. She testified that she suffered from migraine headaches, particularly in the winter months, which required her to remain in the dark for up to three days. She found even the proceedings over her disability claim so stressful that she had taken over-the-counter medications and had someone drive her to the hearing. She also claimed she had to stop on the way so she "could kind of move around." (Tr. 26.) Her migraines could be triggered by almost anything from florescent lights to recurring sounds. (Tr. 27.) Varga claims her hearing was magnified by her fibromyalgia, increasing her sensitivity to sound. (*Id*.) She testified that she treats her pain with over-the-counter medication but sometimes has to resort to Vicodin. (Tr. 27.) She also used Thermo Care heat pads (which she took with her everywhere), a TENS unit (which she used daily), and a hot tub to relieve pain. (Tr. 35.)

Varga told the ALJ that just attending the hearing would likely cause her to be bedridden for four days. On average, she testified she was bedridden between two and three weeks out of the month, depending on the weather. A change in the weather, she testified, affected her muscles, and cold weather increased her pain. (Tr. 27-28.) Varga testified she was careful to pace herself so that she did not end up "for three days on the couch with heating pads and pain pills." (Tr. 29.) On her good days she tries to fold laundry and cook meals. She can drive but tries to avoid stopping

3

at more than three stores when she runs errands because getting in and out of the car causes pain. (Tr. 30.)

The ALJ asked Varga how long she could sit; Varga did not answer directly but did say that sitting in a "regular chair" is "uncomfortable" and she generally sat in a recliner at home. (Tr. 30.) She testified that she could stand for approximately twenty minutes if she was wearing the right shoes and socks. (*Id.*) She stated she used a cane and leaned against things when standing, and her dog would also help her get around even though the dog was not trained or certified. (*Id.*) When asked how much she could lift, Varga described a situation where she lifted two jugs of Hi-C, one in each hand, and was bedridden for three days. (*Id.*) She went on to explain that when her pain is at its worst, she is unable to lift a four-pound bag of Epsom Salt, but when she's feeling better she can lift 20 pounds. (Tr. 31.) The problem was she never knew from day to day what she would be able to do.

Varga also testified that she was being treated for anxiety and depression. She testified that she attended therapy about once a month except in the winter when she could not drive. She had been seeing a psychologist, Dr. Thomas Hayes, for depression since 1999, and had her prescriptions filled through the Veterans Administration. (Tr. 31-33.)

In response to her attorney's questions, Varga stated she could no longer work as a secretary because she had become very forgetful. (Tr. 33.) She testified that she could not regularly lift a gallon of milk. She said she suffered from migraines two or three times per month, but if she lay down and blocked out all noise and light fast enough they would only last 24 hours. (Tr. 34.) She also testified that she typically naps about four hours every day but suffers from insomnia at night. She claimed that her inactivity and medication cause her gastrointestinal problems, and she

4

continued to experience pain from her endometriosis even though her uterus, ovaries and fallopian tubes had been removed. (Tr. 35.)

## II. Medical Documentation

Medical documentation in the administrative record covers the period between 1999 and 2009. (Tr. 119-636.) Varga's medical issues during this period include endometriosis, obesity, hypothyroidism, chronic pain syndrome, post-traumatic stress disorder, and depressive disorder not otherwise specified. (Tr. 16-18, 179-182, 220, 232, 238, 251, and 412.) Varga was treated by a number of physicians at varying times throughout this ten year period. Four doctors are particularly relevant here: Dr. Barbara O'Connell, Dr. Thomas Hayes, Dr. Karl Rudat, and Dr. Jason Bellak.

Varga places great weight on the opinion of Dr. O'Connell, but the record contains only three follow-up reports from Dr. O'Connell from 2005 and two letters from Dr. O'Connell "to whom it may concern" recommending that she be declared disabled. (Tr. 179-82, 219.) Dr. O'Connell, an Associate Professor of Obstetrics and Gynecology at the University of Wisconsin Medical School, states in her letters that she has been treating Varga for endometriosis since 1996 and performed several of her previous surgeries, including a hysterectomy and eventual removal of both her ovaries secondary to the pain and disability that her endometriosis caused." (Tr. 180, 181, 219.) In January 2005, following the last of the surgeries she performed, Dr. O'Connell noted in her follow-up report that Varga was "not having any abdominal or pelvic pain." (Tr. 182.) In July 2005, however, Varga complained of continued pelvic pain. At that time, Dr. O'Connell recommended against further surgery and opined that stress from work was "definitely contributing to continued pain." Dr. O'Connell advised that Varga should "decrease[] her stress to the lowest level possible." (Tr. 181.) Five months later, in January 2006, Dr. O'Connell noted that her

menopausal symptoms were controlled and "her pain symptoms have definitely improved now, but she is currently off work."  (Tr. 179.)

In her letter "to whom it may concern" dated December 5, 2005, Dr. O'Connell noted that in approximately 5% of patients with endometriosis, pain continues even after removal of all pelvic organs.  "Ms. Varga, unfortunately," Dr. O'Connell wrote, "is one of those patients with persistent pain and disability."  (Tr. 180.)  Dr. O'Connell went on to say that Ms. Varga could not function as a correctional officer with her ongoing health problems.  She noted that in her job as a secretary, she was frequently asked to take on other responsibilities, including filling in as a correctional officer.  Based on her review of Varga's job description and the additional duties that were expected of her, Dr. O'Connell recommended that Varga be "declared disabled." (Tr. 180.)  From a medical standpoint, Dr. O'Connell wrote, Varga was "not able to function in her current position for an indefinite period of time."  (*Id.*)  Almost nine months later, on August 15, 2006, Dr. O'Connell wrote a nearly identical letter "to whom it may concern," this time adding a statement that "she is not able to participate in a job which requires any type of lifting and where the job description and activities change on a frequent basis."  (Tr. 219.)  The record contains no further evidence of any examination or treatment by Dr. O'Connell.

In the meantime, Varga was seen at Moundview Memorial Hospital & Clinic on July 18, 2006, by Dr. Elizabeth Davies.  Dr. Davies notes in her report that Varga came in complaining of several symptoms which had been going on over the past week including diarrhea; nausea; chest pains; numbness in her face, arms and legs; muscle aches; and general fatigue.  (Tr. 256.)  Dr. Davies noted Varga's history of endometriosis, irritable bowel syndrome and depression and on general examination described her as "a tearful female who looks very fed up and avoiding eye

6

contact." (*Id.*) Physical examination was otherwise normal and laboratory studies showed a normal complete metabolic panel and a normal white count. EKG results were normal as well, and a chest X-ray was negative. (*Id.*) Dr. Davies indicated an impression of fatigue and malaise possibly due to dehydration and depression. Varga was given a intravenous solution in the emergency room which resolved her symptoms completely, and she felt well enough to go home.

On August 4, 2006, Varga returned to Moundview complaining of migraine headaches which seemed to be aggravated in hot weather. (Tr. 250.) On this occasion she was seen by Dr. Jace Bird. She stated she had joined a weight loss program and had been walking up to two miles a day but stopped in July when her migraines and hot flashes became severe. Dr. Bird assessed atypical migraines and prescribed Imitrex as needed. Dr. Bird advised her to drink plenty of fluids and lie down at the first onset of a migraine. If they persisted, Varga was warned she may have to eliminate caffeine. Dr. Bird also added a prescription for her hot flashes and recommended that Varga restart her exercise program and continue with dietary restrictions. (Tr. 251.)

The record reflects additional visits at Moundview over the next few months for such problems as a rash and right heel pain, pneumonia, and allergies. (Tr. 248, 247, 244.) Dr. Jason Bellak of the Moundview Memorial Hospital and Clinic began treating Varga in September 2007. When he first saw her, Varga complained of abdominal and low back pain, as well as difficulty sleeping. (Tr. 632.) She reported she had been prescribed Hydrocodone/APAP 5/500 tablets, one to two tablets every four hours as needed, since 2004, but was currently taking about ten tablets per month along with Ibuprofen as needed. She was also taking 225 mg. of Effexor daily and Imitrex as needed, which she estimated at three to four tablets per month. (*Id.*) An ultrasound of her abdomen was normal, as were X-rays of her lumbosacral spine. (Tr. 628.) Dr. Bellak prescribed

7

Amitriptyline and instructed Varga to follow up with her psychiatrist. He also recommended she follow up with a gynecologist concerning her abdominal pain, although he was doubtful that it was related to her endometriosis. (Tr. 630.)

Varga saw Dr. Karl Rudat, a gynecologist, in September 2007 regarding her abdominal pain. (Tr. 311.) Dr. Rudat noted Varga reported improvement after each of her previous surgeries, suggesting either that the surgery had placebo effect or that there were actually adhesions that when excised resulted in improvement. (*Id.*) Varga told Dr. Rudat that she would prefer to have another laparoscopy but he wanted to review her previous surgical notes before proceeding with a surgical option. (Tr. 312.) He also thought that part of her current pain could be musculoskeletal resulting from deconditioning due to the pain resulting from her pre-surgical condition. (*Id.*) For this reason, he thought she might even benefit from a physical therapy program, which she apparently undertook. (*Id.*) On October 10, 2007 Varga told Dr. Bellak that physical therapy was helping "a lot" with increased range of motion and decreased pain. (Tr. 625.)

Varga apparently continued to experience pain, however, and on October 25, 2007, Dr. Rudat performed the laparoscopic surgery. (Tr. 304-305.) In the course of the surgery, he noted two areas of fibrosis and a small omental adhesion to the left lower quadrant abdominal wall. Dr. Rudat also noted that the sigmoid colon was adhesed to the left pelvic sidewall. Dr. Rudat excised the two areas of fibrosis and cut the adhesion, thereby mobilizing the colon. (Tr. 305.) He noted "there was very minimal adhesive disease, and no evidence of any type of endometriosis or endometrial scarring." (*Id.*) At a post-operative follow-up visit on November 7, 2007, Dr. Rudat noted that the surgical incision was healing and that Varga reported no fatigue and that her pain

control was improved. (Tr. 298.) The record contains no further follow-up or treatment with Dr. Rudat or any other Ob/Gyn.

On November 21, 2007, Dr. Bellak referred Varga to a dermatologist for psoriasis of her scalp. (Tr. 294.) In March 2008, she had a referral to an endocrinologist to discuss hormone replacement therapy and weight loss. (Tr. 358-59.) In September 2008, Varga underwent a rectal fissurectomy and excision of a sentinel pile. (Tr. 376.) In November 2008 she saw Dr. Bellak for right ear ache and a complaint of urinary frequency. (Tr. 618.) She returned in December 2008 requesting gastric bypass surgery and follow-up on her right knee pain resulting from a fall. An MRI revealed "a moderate size joint effusion in her knee but was otherwise negative. (Tr. 613.) Dr. Bellak reassured her regarding her knee, stating it would take several weeks to completely resolve. He referred her to another clinic to determine whether she was a candidate for gastric bypass. (Tr. 615.)

On April 2, 2009, approximately two weeks before her hearing before the ALJ, Dr. Bellak completed a "Work Restrictions Questionnaire" regarding Varga. (Tr. 607.) He noted he had been providing primary care for her since September 10, 2007 to the present. He had seen her on a total of seven visits with the last in December 2008. The diagnoses listed on the form included obesity; migraine headaches; scalp psoriasis; hypothyroidism; mood disorder, NOS; impaired fasting glucose; and fibromyalgia. Fibromyalgia was later crossed out and replaced with chronic pain syndrome. Dr. Bellak wrote that Varga had a history of chronic neck and abdominal pain, but noted there had been no recent visit or examination for these. (*Id.*) Dr. Bellak noted in the questionnaire that Varga's pain medication may cause impairment, but he was unsure whether her experience of pain and other symptoms was severe enough to interfere with her attention or concentration. He

9

was also unsure if she could tolerate work stress or of what if any functional limitations she had. Dr. Bellak thought emotional factors contributed to the severity of Varga's symptoms or functional limitations and identified depression as a psychological condition that affected her physical condition. In response to the question "Is your patient a malingerer?", Dr. Bellak checked the box indicating "No." (Tr. 607-612.)

For her mental impairments, Varga was seen by Psychologist Thomas Hayes. According to a questionnaire Dr. Hayes completed on February 27, 2006, he had been seeing Varga since December 1999, and was then seeing her about twice per month with her most recent visit on February 2, 2006. (Tr. 184-86.) He listed her current diagnoses as Generalized Anxiety Disorder, Post Traumatic Stress Disorder, Panic Disorder, and Major Depressive Disorder, Recurrent. (*Id.*) Dr. Hayes noted Varga was fully oriented but her affect was depressed and anxious. However, he noted no disturbances in short or long term memory or in her thought processes. Dr. Hayes noted that Varga was agitated when her anxiety and PTSD were present and experienced a lack of energy when depressed. As symptoms, Dr. Hayes noted Varga experienced frequent and recurrent insomnia, an increase in weight, social withdrawal, decrease in energy, and suicidal thoughts without intent. She had no psychiatric hospitalizations. According to Dr. Hayes, Varga's symptoms would vary in intensity, but were sometimes as often as three times per week. He listed her daily activities as child care, pet care, household shopping, and stated she "runs her own business." (Tr. 185.) Dr. Hayes rated Varga's ability to relate to others as "good," noting that occasionally her agitation will put others off but she usually isolates herself during these episodes. (Tr. 186.) He described her intelligence as above average and indicated she did well with therapy and medication but usually discontinued too soon. Dr. Hayes rated Varga's ability to understand, carry out and

remember instructions as "good", as was her ability to "respond appropriately to supervision, co-workers, and routine work pressures and changes in working setting." (*Id.*)

Notwithstanding her lengthy treatment history with Dr. Hayes, the record contains only about five-and-a-half pages of clinical notes covering only ten visits from March 28, 2006 to February 13, 2007, which deal mostly with issues of family dynamics. (Tr. 188-91, 269-71.) On August 14, 2006, Dr. Hayes wrote in a letter "to whom it may concern" in which he stated he recounted that he had stated in two previous letters "that Ms. Varga is unable to work due to physical problems secondary to work stress." (Tr. 220.) Dr. Hayes stated that his experience with Ms. Varga is that "her level of work stress will exacerbate her physical symptoms in any work setting" and that "Varga should not work." (*Id.*) (underlining in original).

On April 3, 2009, Dr. Hayes completed a Mental Impairment Questionnaire in which he indicated that Varga had extreme limitations of daily living, marked limitations in social functioning, and three or more periods of decomposition. (Tr. 605.) He listed her current Axis V Global Assessment of Functioning score ("GAF") at 45 and her highest over the past year at 50. (Tr. 601.) Among the symptoms Dr. Hayes checked at that time were appetite disturbance with weight gain, sleep disturbance, personality change, recurrent panic attacks, anhedonia or pervasive loss of interests, social withdrawal or isolation, mood disturbance, decreased energy, intrusive recollections of traumatic experience, psychomotor agitation or retardation, inappropriate suspiciousness, feelings of guilt or worthlessness, difficulty thinking or concentrating, suicidal ideation or attempts, generalized persistent anxiety, and hostility and irritability. (Tr. 601-02.) Dr. Hayes estimated Varga's impairment or treatment would cause her to be absent from work more than three times a month. (Tr. 603.) He thought her impairments reasonably consistent with her

symptoms and functional limitations and noted that she was not a malingerer but preferred to work. (Tr. 602.)

Varga, a veteran, was also evaluated by two psychologists at the Department of Veterans Affairs ("VA") to assist in determining her eligibility for service connected disability benefits (her endometriosis surfaced during the period of her enlistment). Dr. Charles Moore evaluated Varga in September of 2006. (Tr. 223-233.) He diagnosed her with depressive disorder, pain disorder due to psychological factors and a general medical condition, and endometriosis. (Tr. 232.) He also noted that her GAF was 52 for her depressive disorder and 42 for her pain disorder. (*Id.*) Dr. Michael Brandt evaluated Varga in October of 2005. (Tr. 233-240.) He diagnosed her with major depression, panic disorder without agoraphobia, chronic medical disturbance. (Tr. 238.) He listed her GAF at 50. (*Id.*) The VA physicians agreed that Varga's prognosis for improvement was not good; Dr. Moore listed it as "poor"; Dr. Brandt listed it as "guarded". (Tr. 232, 238.) On February 23, 2009, Varga was notified that she was awarded a 90% service connected disability. (Tr. 636.)

Finally, Varga's records were reviewed by two agency consultants. Medical consultant Robert Callear, M.D., completed a Physical Residual Functional Capacity Assessment on August 24, 2006, in which he concluded that Varga could lift 20 pounds occasionally and 10 pounds frequently. She could stand and/or walk (with normal breaks) for a total of six hours in an eight-hour day and sit for a total of six hours as well. According to Dr. Callear, she had no other physical limitations. (Tr. 193-200.) Consultant Psychologist Roger Rattan completed a Psychiatric Review Technique and a Mental Residual Functional Capacity Assessment on August 25, 2006. Dr. Rattan noted symptoms for both affective disorders and anxiety-related disorders. He found that Varga's mental impairment resulted in moderate limitations in activities of daily living and in maintaining

concentration, persistence and pace, mild limitations in maintaining social function, and no prior episodes of decomposition. (Tr. 201-14.) He also found her moderately limited in her ability to understand and remember detailed instructions, carry out detailed instructions, and maintain attention and concentration for an extended period of time. (Tr. 215.) Dr. Rattan also noted moderate limitations in Varga's ability to accept instructions and appropriately respond to supervisors, to get along with co-workers or peers without distracting them or exhibiting behavioral extremes, and to respond appropriately to changes in work setting. (Tr. 216.)

### III. ALJ's Decision

Based upon the medical evidence on the record and on the testimony adduced at the hearing, the ALJ applied the familiar five-step sequential evaluation process mandated by the Social Security regulations. *See* 20 C.F.R. § 404.1520. First, she found that Varga was currently unemployed. At step two, the ALJ found that Varga had the following severe impairments: obesity, migraine headaches, hypothyroidism, history of endometriosis and irritable bowel syndrome, chronic pain syndrome, post traumatic stress disorder, and depressive disorder, not otherwise specified. (Tr. 14.) The ALJ then concluded that none of Varga's impairments, alone or in combination, met or equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (*Id.*) The ALJ found that Varga had the Residual Functional Capacity ("RFC") "to perform light work as defined in 20 CFR 404.1567(a) except for limitation to non-rapid paced jobs with high production quotas." (Tr. 15.) At step four the ALJ found that Varga had no relevant previous work experience, and thus proceeded to step five where she found that Varga was not disabled because she retained the RFC to perform a significant number of jobs that exist in the national economy. (Tr. 19.)

In reaching that decision the ALJ also considered the testimony of a vocational expert, Elizabeth Cerezo-Donnelly. (Tr. 36.) The ALJ asked the vocational expert to assume a person of Varga's age, education and work experience was restricted to light exertional work as defined in the Dictionary of Occupational Titles and the Social Security Regulations and is limited to "unskilled work that does not require a very fast paced high production quota." Given these assumptions the vocational expert testified that there would still be a substantial number of jobs Varga could perform. She named two examples – a parking lot cashier, unskilled and a housekeeper, unskilled light work. (Tr. 38.)

Plaintiff raises three major issues with the ALJ's determination: (1) the ALJ failed to properly consider the opinions of her treating physicians, notably the opinions of Dr. O'Connell and Dr. Hayes; (2) the ALJ's credibility assessment was not supported by substantial evidence; and (3) the ALJ did not afford proper weight to the VA's disability decision. The Court will address each argument in order. First, it is necessary to set out the standard of review.

## STANDARD OF REVIEW

A district court's review of a social security appeal is limited to determining whether the ALJ's decision is supported by substantial evidence and based on the proper legal criteria. *Scheck v. Barnhart*, 357 F.3d 697, 699 (7th Cir. 2004) (citation omitted). The court reviews the entire record but does not substitute its judgment for that of the Commissioner by reconsidering facts, reweighing evidence, resolving conflicts in evidence, or deciding questions of credibility. *Estok v. Apfel*, 152 F.3d 636, 638 (7th Cir. 1998). However, "[i]n coming to his decision . . . the ALJ must confront evidence that does not support his conclusion and explain why it was rejected." *Kasarsky*

*v. Barnhart*, 335 F.3d 539, 543 (7th Cir. 2003). The ALJ's findings of fact, if supported by substantial evidence, are conclusive. *Scheck*, 357 F.3d at 699 (citation omitted). Substantial evidence is such relevant evidence as a reasonable person could accept as adequate to support a conclusion. *Kepple v. Massanari*, 268 F.3d 513, 516 (7th Cir. 2001) (citation omitted). If the ALJ commits an error of law, however, reversal is required unless the error is found to be harmless. *See Keys v. Barnhart*, 347 F.3d 990, 994-95 (7th Cir.2003) (applying harmless error review to ALJ's determination). The ALJ commits such an error if he fails to comply with the Commissioner's regulations and rulings. *Brown v. Barnhart*, 298 F. Supp. 2d 773, 779 (E.D. Wis. 2003); *see also Prince v. Sullivan*, 933 F.2d 598, 602 (7th Cir. 1991).

The ALJ's decision must also demonstrate the path of his reasoning, and the evidence must lead logically to his conclusion. *Rohan v. Chater*, 98 F.3d 966, 971 (7th Cir. 1996) (citations omitted). While the ALJ need not discuss every piece of evidence in the record, he must provide at least a glimpse into his reasoning. *Zurawski v. Halter*, 245 F.3d 881, 889 (7th Cir. 2001). Even if enough evidence exists in the record to support the decision, the court cannot uphold it if the reasons given by the ALJ do not build an accurate and logical bridge from the evidence to the result. *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996) (citations omitted). While it is true that the ALJ's decision must reflect a fair assessment of evidence and be free of fatal gaps and contradictions, it is also true that a reviewing court must "give the opinion a commonsensical reading rather than nitpick[] at it." *Johnson v. Apfel*, 189 F.3d 561, 564 (7th Cir. 1999).

Finally, an agency's decision cannot be defended on grounds the agency did not rely on. This principle, known as the *Chenery* doctrine, is applicable to judicial review of disability determinations. *McClesky v. Astrue*, 606 F.3d 351, 354 (7th Cir. 2010) (citing *SEC v. Chenery*

*Corp.*, 318 U.S. 80, 87-88 (1943)). But this does not mean that the agency's lawyer is precluded from referring to evidence in the record that supports the agency's decision that the ALJ did not expressly cite. The ALJ need not cite every shred of evidence supporting his findings in order for his decision to be upheld. The standard is whether the decision is supported by substantial evidence in the record, not whether the ALJ has repeated each piece of evidence supporting his decision. It is the record the court is called upon to review, not merely the ALJ's written decision. Judicial review is not simply cite-checking the ALJ's decision. Citing evidence not mentioned by the ALJ to support findings the ALJ actually made is thus not the same as defending the ALJ's decision on grounds the ALJ did not offer or on which he or she did not rely. The latter is a violation of the *Chenery* doctrine. The former is part of what is required for judicial review

.

## ANALYSIS

### I. The ALJ's Assessment of Dr. O'Connell and Dr. Hayes

Varga argues that the ALJ failed to adequately consider the opinion of two of her treating physicians, Dr. O'Connell and Dr. Hayes. (Pl. Br. in Sup. at 10.) In general a treating physician's opinion is entitled to controlling weight if it is well supported by acceptable medical evidence and not inconsistent with other substantial evidence in the record. *See* 20 C.F.R. § 404.1527(d)(2); *Bauer v. Astrue,* 532 F.3d 606, 608 (7th Cir. 2008). On the other hand, where a treating physician's opinion is not well supported by acceptable medical evidence and is inconsistent with other substantial evidence, it is not controlling. In that event, it should be given only such weight as the ALJ finds it deserves in light of various considerations, including the length of the treatment relationship and frequency of treatment, whether the opinion is supported by relevant evidence and

is consistent with other evidence, and the area of specialization of the physician. 20 C.F.R. § 404.1527(d). An ALJ can discount the opinion of a treating physician entirely provided the ALJ articulates a good reason for so doing. 20 C.F.R. § 404.1527(d)(2); *Schmidt v. Astrue,* 496 F.3d 833, 842 (7th Cir. 2007). Given the lack of any contrary evidence and in the absence of proper analysis, Varga argues that controlling weight should have been afforded Dr. O'Connell's and Dr. Hayes' opinions. Even if they were not entitled to controlling weight, Varga argues they were at least entitled to substantial weight.

The Commissioner argues that in fact the ALJ accepted Dr. O'Connell's opinion. Dr. O'Connell, as the Commissioner sees it, opined only that Varga was unable to continue to perform her past work as a correctional officer. The ALJ agreed that Varga could not perform her past work and proceeded to consider whether she could perform other gainful employment. (Br. In Supp. at 8-9.) It is not true, however, that Dr. O'Connell said only that Varga could not perform her past employment as a correctional officer. In her August 15, 2006 letter, Dr. O'Connell stated that Varga was "not able to participate in a job that requires any type of lifting and where the job description and activities change on a frequent basis." (Tr. 219.) Dr. O'Connell further concluded, "From a medical standpoint, she is not able to function in her current position and cannot be gainfully employed for an indefinite period of time." (*Id.*) It is this opinion that the ALJ was required to consider in deciding whether Varga was disabled within the meaning of the Act. Instead, the ALJ seems to have considered only Dr. O'Connell's recommendation that Varga reduce stress.

The Commissioner notes that Dr. O'Connell's August 15, 2006 letter was almost identical to her December 5, 2005 letter, except that in the second letter Dr. O'Connell removed a sentence suggesting that she could continue to work as a secretary if only a reasonable amount of work was

assigned to her and she was not required to assume the responsibilities of other people when personnel shortages occurred. In the second letter, Dr. O'Connell also expressed her view that Varga should be declared disabled because she "cannot be gainfully employed. (Tr. 180, 219.) The Commissioner argues that Dr. O'Connell gave no explanation for the change in her opinion, noting that Dr. O'Connell did not examine Varga a single time between December 2005 and August 2006. Moreover, Varga offers no evidence that could support Dr. O'Connell's change in opinion. "It was therefore reasonable," the Commissioner argues, "for the ALJ to conclude that Dr. O'Connell's opinion supported a finding that Plaintiff could not perform her past work as a corrections officer – an opinion in harmony with the ALJ's own conclusion." (Br. In Supp. at 10.)

The obvious problem with the Commissioner's argument is that it ignores the actual reasoning the ALJ employed in her decision denying Varga's claim. As noted above, the ALJ did not reject Dr. O'Connell's decision; she ignored it. Had the ALJ rejected Dr. O'Connell's opinion that Varga was unable to perform any job that required any type of lifting (a limitation set forth in both of her letters) because there was no medical evidence to support it, her decision would not be subject to the same attack. Indeed, as the above summary of the medical evidence shows, other than in her two letters "to whom it may concern," there is no medical evidence that Varga is unable to lift in Dr. O'Connell's records or those of any other doctor. Moreover, Dr. O'Connell, an ob/gyn, last saw Varga in 2005. In October 2007, Dr. Rudat, also a gynecologist, performed another laparoscopic surgery. At a follow-up visit in November 2007, Dr. Rudat noted improvement, and despite regular treatment with other doctors for unrelated problems, the record shows no further follow-up or treatment with Dr. Rudat or any other Ob/Gyn after November 2007. Given this evidence, the ALJ could reasonably have rejected Dr. O'Connell's opinion, based on her

18

examination and treatment some four years before the hearing, that Varga was incapable of holding employment that required any lifting whatsoever. And she could have reasonably rejected Dr. O'Connell's more general opinion that Varga was completely disabled and unable to perform any gainful employment as invading the province of the ALJ. *See Snell v. Apfel*, 177 F.3d 128, 133 (7th Cir. 1999) (noting that "some kinds of findings-including the ultimate finding of whether a claimant is disabled and cannot work-are 'reserved to the Commissioner.'") (quoting 20 C.F.R. § 404.1527(e)(1)).

Had the ALJ acknowledged Dr. O'Connell's opinion and rejected it on these grounds, her rejection may well have been unassailable. But that is not what the ALJ did, and despite the deferential standard of review that is intended to apply to judicial review of administrative decisions, it is clear that this court cannot affirm on grounds not relied upon by the ALJ. *See Larson v. Astrue*, 615 F.3d 744, 749 (7th Cir. 2010) ("But these are not reasons that appear in the ALJ's opinion, and thus they cannot be used here.") (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 87-88 (1943)). Because the ALJ failed to properly consider Dr. O'Connell's opinion, it follows that the case must be remanded.

Varga also takes issue with the ALJ for failing to properly consider the opinion of Dr. Hayes, her treating psychologist. The ALJ described how Dr. Hayes' opinion had changed over the course of time. She noted that on February 27, 2006, Dr. Hayes reported that Varga had "generalized anxiety disorder with elements of post traumatic stress disorder and panic disorder, and recurrent depression." (Tr. 16.) She was able to take care of her young child, care for her pet, perform household chores and shopping, and was running her own business. She got along with others and had never had any psychiatric hospitalizations. He estimated her IQ at 110 and stated she had a

good ability to understand, remember and carry out instructions, respond to supervisors, interact with co-workers, and handle routine work pressure and workplace changes. (*Id.*) In February of 2009, however, Dr. Hayes reported that she would be absent three or more times per month due to impairments or treatment, had poor or no ability to maintain work attendance, and fair ability to complete a workday/week without interruption from psychologically based symptoms. (Tr. 17.)

Had the ALJ credited Dr. Hayes' February 2009 opinion as to Varga's limitations, a finding that she was disabled would necessarily have followed. But while she found the February 2006 opinion of Dr. Hayes "fully credible" (Tr. 17), the ALJ stated she gave "little weight" to "Dr. Hayes' latter assessment of dramatic limitations" because "such significant deterioration in the claimant's condition is unsupported by documentation of signs, symptoms or objective observations." (Tr. 17.) The ALJ also noted that Varga's treating physicians "responded with limited and conservative treatment." (*Id.*) She noted that such conservative treatment is "inconsistent with the medical response that would be expected if physicians found symptoms and limitations to be as severe as alleged." (*Id.*)

Varga argues that the ALJ failed to consider the fact that Dr. Hayes' 2009 opinion followed three more years of treatment, suggesting that she could have deteriorated over that period of time. Somewhat inconsistently, she also argues that Dr. Hayes' 2009 opinion was in fact consistent with his August 2006 letter "to whom it may concern" in which he stated that "Ms. Varga is unable to work due to physical problems secondary to work stress." (Tr. 220.) The letter continues, "My experience with Ms. Varga is that her level of work stress will exacerbate her physical symptoms in any work setting. I therefore am stating Ms. Varga should not work." (*Id.*) (underlining in original).

In fact, however, the ALJ did consider the possibility that Varga's condition had gotten worse between 2006 and 2009, but rejected that possibility because there was no medical evidence or any mention of such a significant deterioration in Dr. Hayes' records or those of any other doctor. The ALJ also considered Dr. Hayes' August 2006 letter. Unfortunately, like she did with Dr. O'Connell's letter, the ALJ misread what Dr. Hayes was saying. The ALJ read Dr. Hayes August 2006 letter to say that the work stress only prevents Ms. Varga from performing "her most recent job." (Tr. 17.) In fact, however, Dr. Hayes made clear in his letter that he was saying she could not work "in any work setting." It is apparent from the letter that he was attempting to dispel the notion that she might be able to work "in some environment." (Tr. 220.)

Noting that Dr. Hayes prepared his August 2006 letter as evidence in support of Varga's disability claim before the Department of Veterans Affairs, the Commissioner argues that the ALJ was not required to accept Dr. Hayes' opinion that Varga was disabled since, as noted above, the determination of whether a person is disabled is not a medical decision and lies within the province of the Commissioner. *See* 20 C.F.R. § 404.1527(e). The Commissioner also argues that the ALJ rejected Dr. Hayes' August 2006 letter for the same reason she rejected his 2009 findings – that it was not supported by signs, symptoms and findings, and because the limited and conservative treatment was inconsistent with the severity of the symptoms alleged.

The Commissioner's argument is not without merit. The fact that Dr. Hayes' opinion invades the Commissioner's province and is not supported by clinical notes and records would constitute grounds for rejecting it. Moreover, Dr. Hayes' opinion, as expressed in the August 2006 letter, appears to be based primarily on Varga's self-reported "physical problems" (presumably due to her endometriosis) that he felt were exacerbated by stress. In light of the ALJ's adverse

21

credibility determination and given the absence of evidence of ongoing problems with endometriosis, the Commissioner's rejection of Dr. Hayes' opinion may be sustainable. But because the ALJ misread Dr. Hayes' letter, and given the Seventh Circuit's strict application of the *Chenery* doctrine, *see Martinez v. Asture*, No. 10-1957, slip op. at 3 (7th Cir. Jan. 19, 2011), the ALJ should revisit this issue on remand as well.

Moreover, in the event the ALJ finds that Dr. Hayes' opinion is not entitled to controlling weight, she should determine what, if any, weight it is entitled to considering "the length, nature, and extent of the treatment relationship, frequency of examination, the physician's specialty, the types of tests performed, and the consistency and supportability of the physician's opinion." *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009). For example, the record suggests that throughout the ten years he was treating her, Dr. Hayes' treatment consisted entirely of two fifty-minute outpatient therapy sessions twice per month, except in the winter months when driving was difficult. No tests appear to have been performed, and the few clinical notes contained in the record concern problems of family dynamics. There is no indication Dr. Hayes ever referred Varga to a psychiatrist. For most of the ten years she was seeing Dr. Hayes, it appears she was taking Effexor apparently prescribed by one of her other doctors. In 2007, Dr. Bellack added Amitriptylene. If this treatment is inconsistent with the severity of the symptoms claimed, a question that may require psychiatric expertise, the ALJ should explain why. Finally, in assessing Dr. Hayes' opinion, the ALJ should also address the reports of the two VA psychologists who examined Varga, Drs. Brandt and Moore, and found significant impairment.

The Commissioner need not simply adopt the opinions of a treating physician. As the Seventh Circuit has observed, "[t]he patient's regular physician may want to do a favor for a friend

22

and client, and so the treating physician may too quickly find disability." *Stephens v. Heckler,* 766 F.2d 284, 289 (7th Cir. 1985). But the Commissioner must at least accurately state the treating physician's opinions and set forth the analysis required under 20 C.F.R. § 1527(d). Because the ALJ failed to do so here, the case must be reversed and remanded.

## II. ALJ's Credibility Analysis

Varga next contends that the ALJ failed to comply with SSR 96-7p in assessing her credibility. SSR 96-7p governs the ALJ's assessment of allegations of pain or other disabling symptoms. It requires the ALJ to follow a two-step process. First, she must determine whether the claimant suffers from some medically determinable impairment that could reasonably be expected to produce the symptoms. If not, the alleged symptoms cannot be found to affect the claimant's ability to work. If, however, the ALJ finds that the claimant has an impairment that could produce the symptoms alleged, the ALJ must determine the extent to which the symptoms limit the claimant's ability to work. In making this second determination, the ALJ considers the entire record, including the claimant's daily activities; the location, duration, frequency and intensity of the claimant's pain or other symptoms; precipitating and aggravating factors; the type, dosage, effectiveness and side effects of any medication the claimant takes to alleviate pain or other symptoms; treatment, other than medication, for relief of pain or other symptoms; any measures the claimant uses to relieve pain or other symptoms; and any other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms. 20 C.F.R. § 404.1529(c)(3); SSR 96-7p.

The Seventh Circuit has addressed the requirements of SSR 96-7p and the standard of review it employs in assessing the credibility of a Social Security disability claimant on many occasions:

> Under Social Security Ruling 96-7p, the ALJ's determination or decision regarding claimant credibility "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." In this regard it is not sufficient for the adjudicator to make a single, conclusory statement that "the individual's allegations have been considered" or that "the allegations are (or are not) credible." *Id.* It is also not enough for the adjudicator simply to recite the factors that are described in the regulations for evaluating symptoms.

*Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001). At the same time, "[t]he requirement that the ALJ articulate his consideration of the evidence is deliberately flexible." *Stein v. Sullivan*, 966 F.2d 317, 319 (7th Cir. 1992). The "ALJ need not provide a complete written evaluation of every piece of testimony and evidence." *Diaz v. Chater*, 55 F.3d 300, 308 (7th Cir.1995). Moreover, an ALJ's credibility determination is viewed with deference because the ALJ, not a reviewing court, is in the best position to evaluate credibility. *Simila v. Astrue*, 573 F.3d 503, 517 (7th Cir. 2009) (citing *Craft v. Astrue*, 539 F.3d 668, 678 (7th Cir. 2008)). A reviewing court will reverse the ALJ's credibility determination "only if it is so lacking in explanation or support that we find it 'patently wrong.'" *Id.* (quoting *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008)).

In this case, upon comparing Varga's testimony at the administrative hearing to the medical records, the ALJ concluded:

> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity,

persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.

(Tr. 18.) As the Seventh Circuit has noted, this is common boilerplate in ALJ decisions denying claims for social security disability benefits. *Parker v. Astrue*, 597 F.3d 920, 921-22 (7th Cir. 2010). But it is not the meaningless boilerplate criticized by the Court in *Parker*. There the ALJ found the claimant's statements "not entirely credible" without indicating which statements were not entirely credible and what weight she had given them. Here, by contrast, the ALJ found Varga's statements that indicated pain and disability greater than indicated by the RFC were not credible.

In other words, the ALJ found incredible Varga's testimony to the effect that she was essentially bedridden between two and three weeks of every month (Tr. 28), that she used the family dog to assist her in walking (Tr. 30), that she had frequent migraines that rendered her incapacitated for one to three days (Tr. 26), or that she is unable to comfortably sit in a chair other than a recliner. (Tr. 30.) The ALJ concluded:

> [c]ontrary to her claims of being bedridden, the progress notes suggest significant activity and focus on weight loss and deconditioning. It is noteworthy that this increase in activities occurs right after she qualifies for her Veteran's Administration [disability benefits] and disability retirement. This undermines claimant's credibility. The claimant was noted to be participating in an exercise regimen in August 2006, "working out" in March 2008, and was able to care for her young daughter. Menopausal symptoms were controlled with medication.

(Tr. 19.) Perhaps more importantly, the medical records do not substantiate the severe limitations Varga claimed she was experiencing. Although she had significant problems with endometriosis previously, there was no evidence that it continued to limit her after November 2007. Nor is there any indication in the medical records that she ever complained to her various doctors about the severe impairment she described in her testimony. If she were bedridden for two to three weeks of

25

every month, for example, one would expect such a major limitation to be the primary subject of doctor's visits. Yet it is not even mentioned by Varga's treating physicians. Instead between October 25, 2007, when Varga had her most recent laparoscopic surgery (Tr. 304), and the date of the hearing before the ALJ, Varga's complaints to treating physicians include an ear infection (Tr. 618, 620), a urinary tract infection (*Id.*), right knee pain (Tr. 613), and a request for "gastric bypass" surgery for weight loss purposes. (*Id.*) She did undergo surgical treatment for hemorrhoids in September of 2008, but there is no indication that the surgery was not successful. And although the medical records indicate a history of migraines, it appears that she actually sought treatment for that condition only once. (Tr. 250.) In sum, the treatment shown in the medical records is "inconsistent with the medical response that would be expected if physicians found symptoms and limitations to be as severe as alleged." (Tr. 17.)

In sum, the evidence in the record here is sufficient to support the ALJ's finding that Varga was not a credible witness as to the intensity, persistence, and limiting effects of her symptoms. The ALJ's articulation of her reasons for disbelieving her account of her symptoms is sufficient to allow the Court to follow her reasoning and to see the consistency between the ALJ's credibility determination and the evidence of record. *Nelson v. Apfel*, 131 F.3d 1228, 1237-38 (7th Cir. 1997). Rather than offer mere boilerplate or an empty recitation of the factors she was to consider, the ALJ referenced specific facts in the record that demonstrated the path of her reasoning. In light of the deference owed the ALJ, no more is required.

## III. VA Determination

Varga's third and final argument for remand relates to the ALJ's consideration of the VA's disability determination. In September 2006 Varga applied for VA disability benefits. (Pl's Br. at

2.) Two different VA psychologists conducted psychological evaluations of Varga. Both found that Varga suffered from depression or related impairments and opined that her impairments resulted in significant limitations. On October 6, 2006 the VA issued a rating decision that Varga was 70% disabled due to major depression and granted her individual unemployability. (Tr. 108-114). The VA later stated that Varga had a 90% service-connected disability. (Tr. 636.) In order to be "service-connected" a condition need only surface (first occurred or diagnosed) during a period of time when a person was on active duty in the military. In 1994, while stationed at Fort Bragg, North Carolina, Varga was diagnosed with endometriosis. (Tr. 234.) Varga did not receive mental health treatment in the Army but sought out such services in 1999 after she separated from the service. (*Id.*) In her decision the ALJ took note of the VA determination specifically referencing the February 2009 letter from the Veteran's Administration which indicated that the claimant was considered unemployable although not permanently disabled. Tr. 16.) She essentially rejected the VA finding, however, stating:

> The Veteran's Administration determination of significant, but less than total disability is specifically noted to be temporary and utilizes a criteria different from that used by the Social Security Administration for determining disability.

(Tr. 18.) No other consideration of the VA's determination appears in the ALJ's decision, and other than a reference to the fact that Drs. Moore and Brandt conducted evaluations, there is no mention of the results of the evaluations in the ALJ's decision; nor is there any indication of what if any weight they were given.

It is true that the VA determination is not permanent. Unless the VA specifically states in its rating decision that it has assigned a permanent and total rating to a service-connected disability, that rating is subject to reduction under certain circumstances. *See, e.g.,* 38 C.F.R. § 3.327(a)

(1998) (requiring reexamination by VA if a disability has improved or a material change in disability has occurred); *See also* 38 CFR § 3.343(c)(2) (disability rating may be reduced if a veteran deemed "individually unemployable" begins to engage in a substantially gainful occupation lasting over 12 months). The VA may reexamine a veteran to determine whether his or her service-connected disability has improved. *See* 38 C.F.R. § 3.344(a)-(c). But by this standard, the Commissioner's determination that a claimant is disabled is not permanent either. If her condition improves or the claimant goes back to work, benefits can be terminated.

The ALJ also rejected the VA determination because the standard for disability is different, but she failed to indicate what that difference is and how it affects the analysis in this case. According to the February 23, 2009 report from the Department of Veteran Affairs, Varga was found to be unemployable due to a 90% service connected disability. (Tr. 636.) The ALJ concluded that this meant that the VA regarded her disability as less than total, whereas Varga claims it simply means only 90% of her disability was considered service connected. Thus, here too, the ALJ seems to have misinterpreted the evidence.

Of course, even if the VA found Varga totally disabled, its finding is not binding on the ALJ. But that doesn't mean that the VA's determination is irrelevant. The Seventh Circuit has said that the Social Security Administration should give the VA's determination of disability "some weight." *Davel v. Sullivan,* 902 F.2d 559, 560-61 n. 1 (7th Cir.1990). More is required than appears in the ALJ's decision here. If the ALJ chooses to reject the VA's decision because the standard is different, she should explain what is different about the standard. In addition, where as here, the VA determination is supported by evidence that appears in the record, the ALJ should evaluate that

evidence as well and explain why it is rejected.  The ALJ failed to do so here.  For this reason, as well, the decision will be reversed and the case remanded.

## CONCLUSION

The ALJ misread and failed to properly analyze the opinions of Dr. O'Connell and Dr. Hayes.  The ALJ also failed to properly consider the VA determination of disability and the evidence supporting it.  Accordingly, the decision of the Commissioner is reversed and the case remanded for further proceedings pursuant to 42 U.S.C. § 405(g), sentence four.

**SO ORDERED** this ____2nd____ day of February, 2011.

  _s/ William C. Griesbach_____
William C. Griesbach
United States District Judge